Filed 8/15/25  P. v. Ortega CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B337203 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA191775) |
| v. | |
| JOSE LUIS ORTEGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Karla D. Kerlin, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, William H. Shin and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Jose Luis Ortega appeals from a postjudgment order denying his petition for resentencing under Penal Code section 1172.6 (former section 1170.95)[1] as to his conviction of murder. He argues substantial evidence did not support the superior court's ruling following an evidentiary hearing that he could still be convicted of felony murder as a major participant in the underlying robbery and carjacking who acted with reckless indifference to human life. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Evidence at Trial*[2]

    1. *Overview*

Denley Wilson was in his green Toyota stopped behind a van at the intersection of Gage Avenue and Miramonte Avenue in Los Angeles. A man got out of the van, forced Wilson out of his car by gunpoint, and shot Wilson in the chest before returning to the van. The shooter fled in the van while an accomplice drove away in Wilson's car. Ortega was identified as the accomplice who carjacked Wilson's car. Wilson died later at the hospital from the gunshot wound.

---

[1] Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) All statutory references are to the Penal Code.

[2] We draw the facts and procedural history from the trial transcript and clerk's transcript from the original appeal. Although both transcripts were admitted into evidence at the section 1172.6 evidentiary hearing, neither is part of the record on appeal. We augment the record with these transcripts on our own motion. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

2.    *The Shooting*

During the March 2002 trial,[3] two eyewitnesses, Sergio A. and Baudillo H.,[4] testified to slightly different versions of what happened on the day of the shooting, August 20, 1996.

Sergio testified that he was standing outside a house on Miramonte. He saw a man drive a "little green Toyota car" out of a driveway and northbound on Miramonte. As the car approached the intersection at Miramonte and Gage, it pulled behind a van that was stopped at a red light.

Sergio saw "four or three" people in the van. Based on how the assailants were dressed, Sergio thought they were gang members. A man with a tattoo on the back of his head got out of the van with a gun in his hand and walked toward the driver's side door of the Toyota. The man pointed the gun at the driver of the Toyota, and the driver stepped out of the car with his hands up. The driver said something like, " 'No. Please don't.' "

Sergio saw a flash, heard a bang, and saw the driver of the Toyota fall. The shooter got back into the van. A second person got out of the van, walked by the victim, and got inside the Toyota. As the second person walked by the victim, Sergio saw the person make "some type of" "kicking movement" toward the victim; it seemed like the victim "got kicked." The van drove away quickly followed by the Toyota.

Police officers interviewed Sergio on the day of the shooting. Sergio told them that the second person who got out of

---

[3]    Ortega's first jury trial in 2001 resulted in a mistrial after the jury hung (11 to one, with 11 in favor of guilt).

[4]    We refer to the witnesses by their first name and last initial only. (See Cal. Rules of Court, rule 8.90(b)(4), (b)(10).)

the van was the shooter. He also said the shooter did not have any tattoos. At trial, when asked why he gave these inconsistent statements, he testified he was "confused" and "scared" when he spoke to the police.

In August 1999, detectives showed Sergio a picture of Ortega. Sergio identified Ortega as one of the men involved in the carjacking and shooting. However, Sergio could not remember exactly what role Ortega played.

Baudillo testified that he was in his car stopped at a red light at the intersection of Gage and Miramonte when he saw a man driving a small green Toyota on Miramonte. A van drove alongside the Toyota and then around it, stopping in front of the Toyota and blocking its path.

Baudillo saw four men in the van. The driver of the van stayed inside the car while two or three others, including a man he identified as Ortega, got out and walked toward the Toyota. One of Ortega's accomplices pointed a gun at the driver of the Toyota. The driver got out of the car with his hands up and said, " 'Don't shoot; Don't shoot.' " Ortega and the two accomplices went through the driver's pockets and took several items.

Ortega got into the Toyota, leaving the two accomplices behind, including the one with the gun. The accomplice with the gun shot the driver in the chest, causing him to fall. The shooter and other accomplice got back into the van, said " 'Let's go; Let's go,' " and drove off behind the Toyota.

3.    *Police Investigation*

Deputy Medical Examiner Louis Pena testified that Wilson died at the hospital of a gunshot wound to the chest. According to Pena, Wilson also had a "large area of bruising" on his

4

abdomen. The bruise indicated "some force" had been applied to the area.

Hours after the shooting, police found Wilson's Toyota one mile from the crime scene. The radio and wheels were missing. Ortega's fingerprints were not on the car. In 1999, police found the van used in the shooting. The van was registered to Ortega at the time of the shooting.

4. *Ortega's Police Interview*

In 1999, after discovering the van, Deputy Agustin Ortiz of the Los Angeles County Sheriff's Department found Ortega in custody in Wyoming and went there to interview him. Ortiz saw Ortega had a tattoo on the back of his head. Ortega told Ortiz that he was an active member of the Florencia 13 gang.

Ortega said that on the day of the shooting, he was driving his van and three other fellow gang members. Ortega stopped at a traffic light at Miramonte and Gage, and a green car pulled up behind him. One of Ortega's passengers got out of the car and approached the driver of the green car "with intentions of taking the car by force." Ortega referred to the action as " 'carjacking, I guess.' " Ortega told Ortiz that he did not know "what [his passenger] was going to do" and he did not know his passenger had a gun.

Ortega said, "everything happened very, very fast . . . so he yelled out, 'Hurry up, let's go. Don't shoot him.' "[5] The passenger who got out of his van shot the driver of the green car, got into the victim's car, and drove away. Ortega followed behind the stolen car for a short distance.

---

[5] Sergio testified he did not hear any of the men other than Wilson say anything before the man shot Wilson.

5

B.    *Defense Evidence*

During an interview with the police on the day of the crime, Baudillo made a statement suggesting he saw multiple guns, but at trial, Baudillo testified he meant that one of the two men who got out of the car had a gun.  Also, during the initial interview of Baudillo, the officer asked Baudillo, " 'The one that was driving, did he say anything?' " Baudillo replied, " 'Let's go, Let's go. Don't shoot, don't shoot.' "  At trial, however, Baudillo testified "the victim was the one who yelled not to shoot him. and the driver was the one who shouted, 'Let's go, let's go.' "  In a second police interview in 1999, Baudillo similarly indicated that it was the victim who yelled, "Don't shoot," and the driver of the car who said, "Let's go."

C.    *Verdict, Sentencing, and Appeal*

In 2002, a jury found Ortega guilty of first degree murder (§ 187, subd. (a)), robbery (§ 211), and carjacking (§ 215, subd. (a)).  The jury found true the special circumstance that the murder was committed while Ortega was engaged in a robbery and carjacking.  (§ 190.2, subd. (a)(17).)  As to each offense, the jury also found true that a principal was armed in the commission of the offense.  (§ 12022, subd. (a)(1).)

The trial court sentenced Ortega to life without the possibility of parole for murder with the special circumstance that Ortega committed the murder while engaged in a robbery (§ 190.2, subd. (a)(17)(A)), plus one year for the firearm enhancement.  The court also imposed and stayed a second term of life without the possibility of parole for murder with the special circumstance that Ortega committed the murder while engaged

6

in a carjacking (§ 190.2, subd. (a)(17)(L)).  As to the robbery count, the court stayed the middle term of three years, plus one year for the firearm enhancement.  The court imposed but stayed the middle term of five years for the carjacking count, plus one year for the firearm enhancement.

Ortega appealed.  We affirmed the judgment but struck the second life sentence because Ortega was charged with only one count of murder and one special circumstance.  (*People v. Ortega* (Nov. 8, 2004, B160750) [nonpub. opn.].)

D.    *Resentencing Proceedings*

On April 11, 2019, Ortega filed a petition for resentencing under former section 1170.95 as to his murder conviction.  The superior court denied his petition at the prima facie stage, finding Ortega was ineligible for resentencing because of the special circumstance finding by the jury.  The court also found, based on its analysis of the underlying facts of the case, that Ortega was a major participant who acted with reckless disregard for human life.

Ortega appealed.  We reversed and remanded for the superior court to issue an order to show cause and hold an evidentiary hearing under section 1172.6, subdivision (d).  We held the court erred in relying on the special circumstance finding because Ortega was convicted almost two decades before the Supreme Court's holdings in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified the factors a jury should consider in finding a defendant was a major participant in an underlying felony who acted with reckless disregard for life.  We also held

7

the court erred by engaging in premature factfinding. (*People v. Ortega* (Feb. 9, 2022, B308609) [nonpub. opn.].)

On remand, the court conducted an evidentiary hearing. Neither party submitted new documentary evidence or called witnesses. The court denied the petition, finding beyond a reasonable doubt Ortega is guilty of felony murder under current law as a major participant in the underlying robbery and carjacking who acted with reckless indifference to human life. The court reasoned Ortega was a major participant because: (1) "[h]e [wa]s the one who stopped the van and perhaps blocked the victim's vehicle . . . so that . . . Ortega and/or the other could get out and approach the victim"; (2) there was "[a]t least one" gun present; (3) Ortega and his accomplices were gang members; (4) he was present at the scene and "kicked the victim"; and (5) he drove away after the shooting.

The court found Ortega acted with reckless indifference because: (1) there "was at least one gun used" and "[i]t is likely that [Ortega] knew there was a gun"; (2) he "was clearly physically present at the scene," and "[t]here is no evidence he did anything to prevent the crime or aid the victim"; (3) the crime "rapidly unfolded within a matter of perhaps minutes"; (4) "[i]t is likely that [Ortega and his accomplices] knew each other's propensity for violence" because "[t]hese were fellow gang members"; and (5) "[t]here was no evidence that [Ortega] made efforts to minimize the risk of violence other than his . . . self-serving statement [where] he said, 'Don't shoot.' "

Ortega timely appealed.

8

## DISCUSSION

A.    *Section 1172.6 and Standard of Review*

Effective 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) substantially modified the law governing accomplice liability for murder.  (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*); *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).) Relevant here, it narrowed the felony-murder rule by adding section 189, subdivision (e), to the Penal Code.  (*Curiel*, at p. 448.) Under that provision, "[a] participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (§ 189, subd. (e).)

Senate Bill No. 1437 also provided a procedure for a person convicted of felony murder to petition the superior court to vacate the conviction and be resentenced on any remaining counts if the person could not now be convicted of murder because of the changes to section 189.  (§ 1172.6, subd. (a).)  The resentencing procedure begins with the filing of a petition containing a declaration that all requirements for eligibility are met. (§ 1172.6, subd. (b)(1)(A); *Strong, supra*, 13 Cal.5th at p. 708.) The superior court must then determine whether the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subds. (a)-(c); *Strong*, at p. 708.)

9

If the petitioner has made a prima facie showing he or she is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.  (§ 1172.6, subd. (d)(1).)  At the evidentiary hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony.  (§ 1172.6, subd. (d)(3).)  The petitioner and the prosecutor may also offer new or additional evidence.  (*Ibid*.)

On appeal from an order denying a petition under section 1172.6, we apply the substantial evidence standard of review. (*People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).) "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact" ' " ' could find [the necessary fact] beyond a reasonable doubt."  (*Ibid*.)  " ' "While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." ' " (*People v. Pittman* (2023) 96 Cal.App.5th 400, 414.) " ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 339.)

B.    *Major Participant and Reckless Indifference Standard*

A participant in the perpetration of certain enumerated felonies, including robbery and carjacking, may be liable for murder if the People prove he or she "was a major participant in the underlying felony and acted with reckless indifference to human life," within the meaning of section 190.2, the special circumstances statute.  (§ 189, subds. (a), (e); *Strong, supra,* 13 Cal.5th at p. 708.)  Our Supreme Court in *Banks, supra,* 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th 522 "clarified the meaning of the special circumstances statute" (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*)) and identified a "nonexhaustive" list of factors or considerations relevant to determining whether a defendant is liable for murder under section 189, subdivision (e)(3) (*Strong,* at pp. 706-707).  "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks,* at p. 803; accord, *Clark,* at p. 618.)  Instead, determining a defendant's culpability for felony murder requires a "fact-intensive, individualized inquiry" into "the totality of the circumstances." (*Scoggins,* at pp. 677, 683.)

In *Banks,* the Supreme Court identified the following factors courts must consider in determining whether a defendant is a major participant:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did

11

the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted; accord, *Clark*, *supra*, 63 Cal.4th at p. 611.) The "ultimate question [is] whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks*, at p. 803.)

In *Clark*, the Supreme Court specified the relevant factors in determining whether a defendant acted with reckless indifference to human life. The court observed these factors " 'significantly overlap' " with the major participant factors because " 'the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.) The factors include " 'use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.' " (*Emanuel*, *supra*, 17 Cal.5th at p. 884; see *Strong*, *supra*, 13 Cal.5th at p. 706, citing *Clark*, at pp. 618-623.)

"[R]eckless indifference encompasses both subjective and objective elements. [Citations.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' [Citations.] 'As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct

12

that a law-abiding person would observe in the actor's situation.' " ' "  (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) " ' "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement.' " (*Ibid*.)

"The essential question underpinning our analysis" of the *Banks* and *Clark* factors is "what [the defendant's] actions reveal about his mental state."  (*Emanuel*, *supra*, 17 Cal.5th at p. 891.) "The nonexhaustive list of factors identified as relevant to the [major participant and] reckless indifference inquiry must not supplant the standard they are meant to elucidate."  (*Id*. at p. 896.)

C.    *Substantial Evidence Supported the Finding Ortega Was a Major Participant*

Substantial evidence shows Ortega's participation in the underlying robbery and carjacking "was sufficiently significant to be considered 'major.' " (*Banks*, *supra*, 61 Cal.4th at p. 803.)

There was evidence that Ortega "was on the scene from start to finish."  (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 (*Mitchell*) [defendant's physical presence "on the scene from start to finish" supported major participant finding]; see also *In re Loza* (2017) 10 Cal.App.5th 38, 50-51 ["there may be significantly greater culpability for accomplices who are present"]; cf. *Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5 ["In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death."].)  From the start, Ortega played an instrumental role in

13

setting up the underlying robbery. Ortega told police that on the day of the shooting, he drove his own van and three other fellow gang members to the traffic light at Miramonte and Gage. Based on Baudillo's testimony, Ortega drove to where Wilson was stopped at a red light, and blocked Wilson's car from moving. Baudillo testified that Ortega approached Wilson, stood by while his cohort ordered Wilson out of his car at gunpoint, and rummaged through Wilson's pockets. (See *Mitchell*, at p. 591 [fact that petitioner split proceeds equally with gunman supported major participant finding].)

Most importantly, there is evidence that Ortega was present at the scene when his cohort shot Wilson in the chest. Sergio testified that after the shooting, an accomplice got out of the van, kicked Wilson, and drove away in Wilson's car. The superior court reasonably inferred that Ortega was the one who kicked Wilson and drove away in Wilson's car, given that Baudillo identified Ortega as the accomplice who stole Wilson's car. Although other parts of Baudillo's testimony—namely, that Ortega drove away in Wilson's car *before* the shooting—conflict with Sergio's testimony that the accomplice who stole Wilson's car fled *after* the shooting, " 'conflicts . . . do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Reviewing the evidence in the light most favorable to the prosecution, the evidence supports the conclusion that "[a]t every stage, [Ortega] was a full partner in crime." (*Mitchell*, *supra*, 81 Cal.App.5th at p. 591 [fact that petitioner participated in every stage of crime supported major participant finding].)

14

Even if Ortega was not the one who supplied or used the gun, the "warning signs that the crime[] posed a serious risk of danger . . . accumulated as the crime[] unfolded." (*People v. Montanez* (2023) 91 Cal.App.5th 245, 273.)  When Ortega got out of his van and approached Wilson, Ortega would have seen his accomplice point a gun at Wilson and order Wilson out of the car. Thus, from the beginning of the robbery, Ortega would have been aware that his cohort's use of a gun increased the risk of danger. (See *ibid.* [defendant saw his accomplice point a gun directly at the victim, "which was an implicit threat to shoot her" and served as a warning sign that the crime posed a serious risk of danger].)

Ortega's conduct after his accomplice used lethal force also supports a finding that he was a major participant.  As noted, the superior court credited testimony that after Ortega's cohort shot Wilson in the chest, Ortega kicked Wilson.[6]  Ortega also singlehandedly carried out the carjacking by getting into Wilson's car and driving it away, leaving Wilson fatally wounded.  (See *People v. Nieber* (2022) 82 Cal.App.5th 458, 477 [substantial evidence supported major participant finding where petitioner was present when violence was used and left while victims were bound with their faces covered]; *In re Loza*, *supra*, 10 Cal.App.5th at p. 51 [substantial evidence supported major participant finding where petitioner was present and "did not intercede in any way" to stop violent conduct and fled afterward].)

Although Ortega told police a different version of events, including that he said " 'Don't shoot' " before his cohort fired the gun, his statements were contradicted by Baudillo's and Sergio's

_____

[6]     In addition to Sergio's testimony that he saw the carjacker kick Wilson as he lay on the ground, a bruise on Wilson's abdomen showed force had been applied to that area.

15

testimony.  Baudillo heard *Wilson* say, " 'Don't shoot; Don't shoot,' " and Sergio heard Wilson say something like, " 'No. Please don't.' "  Sergio testified he did not hear any of the men involved in the carjacking say anything before Wilson was shot. And while the transcript of Baudillo's initial police interview states Baudillo said he heard the van's driver say, "Let's go, Let's go, don't shoot," in a later interview and in his trial testimony, Baudillo stated it was Wilson who said "don't shoot," and the driver of the van only said "let's go."  Thus, the trial court was free to disregard Ortega's "self-serving" statements as lacking credibility.  (*People v. Pittman*, *supra*, 96 Cal.App.5th at p. 414 [trial judge must "resolve contradictions, and make determinations as to credibility," and appellate court's "job is to determine whether there is any substantial evidence"].)  And where the trial court makes such findings upon "conflicting evidence," those findings are "conclusive."  (*Emanuel*, *supra*, 17 Cal.5th at p. 885, fn. 7; see *People v. Oliver* (2023) 90 Cal.App.5th 466, 484 [where trial court impliedly found witness's testimony credible, appellate court "cannot second-guess that conclusion"].)

Substantial evidence was presented that Ortega was a central figure, and at certain moments, the lead figure, in all aspects of the robbery and carjacking.  Thus, his participation was " 'major.' "  (*Banks*, *supra*, 61 Cal.4th at p. 803.)

D.  *Substantial Evidence Supported the Finding Ortega Acted with Reckless Indifference*

Substantial evidence similarly supports the trial court's finding Ortega acted with reckless indifference to human life during the robbery and carjacking.

Ortega's presence at every step leading up to the murder weighs against him. (See *Clark*, *supra*, 63 Cal.4th at p. 619 [stressing "the importance of presence to culpability"].) As discussed, there is evidence that he observed his cohort point a gun at Wilson during the entire robbery. The superior court credited evidence that, despite seeing this risk of lethal violence, Ortega did not act as a restraining influence. (See *ibid.* [" 'If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' "]; cf. *Emanuel*, *supra*, 17 Cal.5th at p. 891 [insufficient evidence of reckless indifference where defendant said " 'let's go' " and began walking away from the robbery]; *Scoggins*, *supra*, 9 Cal.5th at p. 678 [defendant, who remained at a nearby gas station during the crime, "was not in a position to restrain" the shooter]; *In re Taylor* (2019) 34 Cal.App.5th 543, 559 [defendant "could not even see" the shooter's interaction with the victim].)

Most notably, Ortega's conduct following the shooting demonstrates his reckless indifference to the shooting of Wilson. (See *Emanuel*, *supra*, 17 Cal.5th at p. 893 ["a defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense"].) Ortega did not appear surprised, nor did he do anything to suggest he rejected or was taken aback by his cohort's lethal actions. Rather, the evidence at trial supports the conclusion that after seeing his accomplice shoot Wilson in the chest, Ortega did the opposite of rendering aid: He kicked Wilson while Wilson was lying on the ground. Ortega then stole Wilson's car and fled the scene.

These actions provide a window into Ortega's state of mind during the carjacking and suggest he shared his cohort's murderous intent. (See *People v. Nieber*, *supra*, 82 Cal.App.5th

17

at p. 479 [substantial evidence supported reckless indifference finding where defendant did not render aid to the murder victim, "whom intruders left lying face down in a pool of blood"]; *Mitchell*, *supra*, 81 Cal.App.5th at p. 593 [same where defendant "never moved away from the violence," suggesting "the gunshots were unsurprising to him"]; cf. *Emanuel*, *supra*, 17 Cal.5th at p. 891 [fact that defendant "abandoned the plan rather than resort to greater violence" provided "crucial insight into [his] state of mind"].)

Substantial evidence supports the court's findings that Ortega consciously disregarded " 'the significant risk of death' " his actions created and that his conduct grossly deviated from the standard of conduct of a law-abiding person. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

## DISPOSITION

The judgment is affirmed.

STONE, J.

We concur:

SEGAL, Acting P. J.

FEUER, J.

18